## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OLUSEGUN ADELEGAN,
an individual,
   13114 Burleigh Street,
   Upper Marlboro, MD 20774,

       Plaintiff,

                                No. 1:10-cv-03440

v.

DISTRICT OF COLUMBIA,
   Serve: Hon. Muriel Bowser, Mayor
   Wilson Building
   1250 Pennsylvania Avenue, N.W.
   Washington, D.C. 20005
      --and--
   Attorney General of the District of Columbia
   441 4th Street, N.W., Suite 1100
   Washington, D.C. 20001

       Defendant.

## COMPLAINT

### *Introduction*

1.    This civil action under 42 U.S.C. § 1983 and D.C. Code § 32-1308 seeks redress for violations of the due process and expressive rights of an outstanding and dedicated D.C. Public Schools ("DCPS") teacher who was kept for two years in a bizarre employment limbo, forbidden to work and for school year 2017-18 deprived of pay, because of DCPS' decision to suspend and terminate him on mental health and past marijuana use pretexts as retaliation for criticizing them—truthfully and articulately—in an off-duty social media posting.

2.    This suit claims that DCPS' mistreatment of the plaintiff violated his rights to free expression and due process under the First and Fifth Amendments to the federal

Constitution, and also violated his employer's obligations under the D.C. wage theft statute, D.C. Code § 32-1301 *et seq.*

### Parties, jurisdiction and venue

3.     Plaintiff Olusegun ("Segun," pron. SHEH-gun) Adelegan, an award-winning teacher in the D.C. Public Schools, is a citizen of the United States and a resident of the District of Columbia. Until his unjustified suspension from employment in November 2016, he was a teacher, instructional coach and curriculum coordinator at Wheatley Education Campus in northeast D.C. ("Wheatley"), a non-charter public high school run by the District of Columbia Public Schools ("DCPS"). Before that, he taught middle school mathematics at Browne Education Campus, also in northeast D.C. ("Browne"), and before that also at Wheatley, where he was recognized in 2015 as DCPS New Teacher of the Year. He is an alumnus of Harvard's Urban Teacher Center in Baltimore, and is a recipient of DCPS' Rubenstein Award for Highly Effective Teaching. Today, after almost two years out of work, he is re-employed at DCPS' Burrville Elementary School. In his spare time he is a founding member of Sanctuaries, a D.C. non-profit that provides physical spaces and support for artists of diverse racial and religious backgrounds to contribute to D.C.'s cultural life.

4.     Defendant District of Columbia is the municipality of which DCPS is an agency. The District is sued under court decisions, *e.g., Blackmar v. Guerre*, 342 U.S. 512 (1952), which require that the District be the sole named defendant in suits against its agencies and personnel, and *Patsy v. Board of Regents*, 457 U.S. 496 (1982), which exempt most constitutional claims by government employees from the requirement that administrative procedures, *e.g.,* grievance procedures under an applicable labor agreement, be exhausted before or rather than filing suit. Notice of this claim under D.C. Code § 12-309 was timely lodged with the District on February 28, 2018.

5. This Court has jurisdiction over the federal claims in this case under 28 U.S.C. § 1331 because the claims asserted herein raise questions under the federal Constitution and laws; under 28 U.S.C. §§ 1343(a)(3), 1343(b)(1), and 42 U.S.C. § 1983 because this suit claims violations by a District of Columbia governmental agency of the federal constitutional rights of the plaintiff; and under D.C. Code § 22-1308(a)(1) because this suit claims violations of the D.C. wage theft statute, D.C. Code 22-1301 *et seq.*

6. Venue is proper in this District under 28 U.S.C. §§ 88, 1391(b)(1), and 1391(b)(2) because the defendant is located in the District of Columbia.

### *Factual allegations regarding the original incident*

7. Mr. Adelegan began working at DCPS' Wheatley Education Campus high school in northeast D.C.'s Trinidad neighborhood in September 2016. There he served full-time as a teacher, instructional coach, and curriculum coordinator.

8. On November 3, 2016, on his way to work, Mr. Adelegan recorded and posted a brief Facebook livestream video, between one and two minutes in length, that was critical of his school's disservice to its students, and of the role of its administrators and staff in that disservice.

9. Specifically, Mr. Adelegan complained in the Facebook posting that Wheatley and the D.C. educational system in general was failing its students; that children at Wheatley were not being pushed to fulfill their intellectual capabilities; and that sexual misconduct had occurred between a Wheatley custodian and a Wheatley student.

10. By the time Mr. Adelegan arrived at Wheatley, his superiors had already seen the Facebook video he had posted minutes earlier.

11. The door to the Wheatley building was locked when Mr. Adelegan tried it, and personnel inside physically barred him from entering.

12.     Moments later, three D.C. Metropolitan Police Department ("MPD") officers who provided security at Wheatley, one of whom Mr. Adelegan knew personally, appeared at the building's front entrance. Mr. Adelegan told the officer known to him that he needed to speak with her about issues at Wheatley. At his request, they agreed to meet a short distance away at the Browne Education Campus ("Browne"), the school where Mr. Adelegan had taught during the previous school year.

13.     None of the three MPD officers, nor any other person, told Mr. Adelegan why he had been barred from the building, but he understood that it was because of his Facebook posting.

14.     When Mr. Adelegan arrived a few minutes later at Browne, its principal, Andre Samuels, came outside and embraced him. Mr. Adelegan had not called or notified Mr. Samuels that he was coming.

15.     Mr. Adelegan was then met outside the school by two D.C. Metropolitan Police officers, neither of them the one whom he had agreed to meet there, and to his shock and surprise placed in handcuffs and taken against his will to the D.C. General Hospital complex in southeast D.C., where he was told he must undergo a psychological examination by the Comprehensive Psychiatric Emergency Program ("CPEP") of the D.C. Department of Behavioral Health.

16.     At the time of these events, and at all relevant times from then on, Mr. Adelegan was not suffering from any form of mental illness or disturbance.

17.     CPEP released Mr. Adelegan almost immediately, concluding that he was not mentally ill, not deranged or disturbed, not a present or potential threat or danger to himself or others, and not in need of mental health services of any kind.

18.     At the time of these events, and at all relevant times from then on, neither Mr. Adelegan's superiors at Wheatley, nor any DCPS official or employee, nor any other D.C. official or employee had reason to believe that Mr. Adelegan required mental health treatment or was in any way, mentally or otherwise, unfit for duty as a DCPS teacher.

19.     Later on the same day, November 3, 2016, Mr. Adelegan received an e-mail from DCPS informing him that he had been placed on indefinite administrative leave, with pay, from his Wheatley teaching position, with no explanation, and barring him from his place of employment without giving him so much as a chance to say goodbye to his students.

20.     On November 15, 2016, Mr. Adelegan received an e-mail from DCPS requiring a mental health "fitness for duty examination" as a condition of his return to work. Again, no explanation was provided.

21.     Although Mr. Adelegan firmly disagreed with DCPS' position, he endeavored to comply with the directive described in the preceding paragraph by searching for a mental health professional who would see him. On January 3, 2017, he met with Dr. Gerald Perman, M.D., a board-certified psychiatrist in private practice in northwest D.C., to be given the fitness for duty examination DCPS had required. Dr. Perman explained to Mr. Adelegan during that appointment that he would forward to DCPS the results of the examination.

22.     On April 20, 2017, after having heard nothing from DCPS since January, Mr. Adelegan received an e-mail from Melody Miller of DCPS Labor Management and Employee Relations. She requested, as a "follow-up" to the fitness for duty examination, that he release his complete behavioral health records to Washington Occupational Health Associates ("WOHA"), which he now knows (but did not know at the time) is a private consultant to DCPS that, among other services, conducts drug and alcohol screenings of individuals.

23.     On April 24, 2017, Mr. Adelegan e-mailed Ms. Miller that he had filled out a request with Kaiser Permanente, his health care provider, for the records she had requested, and would hand-deliver them to WOHA as soon as they became available (estimated by Kaiser to be 7 to 10 days). When the Kaiser records became available, Mr. Adelegan did so.

24.     On May 5, 2017, Mr. Adelegan e-mailed Ms. Miller that he had hand-delivered the requested records to WOHA, and that he had signed a release at Kaiser that would allow WOHA to speak with his Kaiser therapist.

25.     On May 22, 2017, Mr. Adelegan e-mailed Ms. Miller asking whether any steps had been taken on her side. She replied that she had heard nothing from WOHA and would follow up with them.

26.     On June 1, 2017, Mr. Adelegan e-mailed Ms. Miller again to ask whether WOHA had corresponded with her. This time she replied that he needed to contact WOHA to obtain additional direction. He did so.

27.     On June 6, 2017, Ms. Tonya Akbar, clinic manager at WOHA, gave Mr. Adelegan a medical information release form with instructions that he present that form to Kaiser to permit WOHA to speak with behavioral health at Kaiser. In so instructing, WOHA required Mr. Adelegan to repeat the action described in ¶ 24 above.

28.     On June 8, 2017, Mr. Adelegan faxed to WOHA a signed copy of the release form described in the preceding paragraph.

29.     In late June 2017, after many calls to WOHA's offices in an attempt to speak with Ms. Akbar, Mr. Adelegan finally reached her and was told that he had not been seeing the "right doctor." She stated that he should be seeing a psychiatrist, not a psychologist. Mr. Adelegan responded that he had never received any communication that said anything of the sort; that in fact he had seen a psychiatrist, Dr. Perman, in November 2016, as alleged in ¶ 21

above; and that Dr. Perman had transferred him to a psychologist because Mr. Adelegan had

no conditions warranting prescription medication.

30.     In early July 2017, after repeated telephone calls to Ms. Akbar and Ms. Miller,

Mr. Adelegan was told by Ms. Miller that if he gave DCPS a letter from his treating doctor at

Kaiser stating that he was fit for duty, DCPS would find it acceptable.

31.     On July 24, 2017, Mr. Adelegan met again with a psychiatrist at Kaiser, and

explained that he needed a letter stating he was fit for duty. The Kaiser psychiatrist readily

agreed to write such a letter, saying she saw no reason that he should not be allowed back to

work, but asked for a "fitness for duty" form, checklist or job description list from DCPS.

32.     Mr. Adelegan immediately asked Tonya Akbar about such a checklist and was

told to contact DCPS.

33.     On July 26, 2017, Mr. Adelegan e-mailed Ms. Miller at DCPS asking for a

checklist and a job description. He received no response.

34.     On August 1, 2017, Mr. Adelegan once again e-mailed Ms. Miller asking whether

there was any update. This time she replied that she had to speak with her deputy chief.

35.     On August 4, 2017, Mr. Adelegan received an e-mail from Ms. Miller with his

Instructional Coach job description. He immediately forwarded this to his doctor at Kaiser.

36.     On August 7, 2017, Mr. Adelegan received a letter from his doctor at Kaiser

stating that he was fit for duty and ready to return to work. He promptly e-mailed Ms. Miller

to ask what was DCPS' most preferred method of delivery.

37.     On August 8, 2017, Ms. Miller replied that Mr. Adelegan should send the letter

to Tonya Akbar at WOHA. Mr. Adelegan promptly faxed the letter to Ms. Akbar, but received

no response.

38.     During the week of August 14 through 18, 2017, with the 2017-18 DCPS school year rapidly approaching (the first day of the academic calendar was Monday, August 21, 2017), Mr. Adelegan repeatedly called Ms. Akbar. When she finally answered one of his calls, she told him that he would be required to sign another medical release form to allow the psychiatrist who wrote the letter on his behalf to speak with WOHA. She instructed Mr. Adelegan to use the same form that he had sent before, simply crossing out the psychologist's name and filling in the psychiatrist's name. Mr. Adelegan promptly did so.

39.     On August 21, 2017, Ms. Akbar e-mailed Mr. Adelegan that he needed to submit a new release form because the crossed-out one would not be accepted. Mr. Adelegan completed and faxed a new form on the same day. He received no response.

40.     During the weeks of August 21 through September 1, 2017, Mr. Adelegan repeatedly telephoned for Ms. Akbar in an effort to confirm her receipt of the document, and to determine whether anything had been done with regard to his case. His calls to her were never answered.

41.     On September 1, 2017, the scheduled date of a direct deposit of his paycheck from DCPS, Mr. Adelegan discovered that no such deposit had been made. It was apparent that his paid administrative leave had ceased, but without notice or communication of any kind. He was not told that he had been terminated, or that an investigation of him had occurred or had concluded, and was given no opportunity whatever to confront his accusers or learn the charge or charges against him, if any.

42.     Because he had not been terminated, Mr. Adelegan was ineligible to apply for unemployment compensation with the D.C. Department of Employment Services.

43.     He called Ms. Miller at DCPS but was not given an explanation of why he had been taken off administrative leave. In effect he had been placed in limbo, with no work, no

pay, no unemployment compensation, no official status, and no recourse to determine or rectify it.

44.    Mr. Adelegan promptly forwarded to Ms. Miller the same medical release form he had sent to Ms. Akbar at WOHA, to show that he had been providing WOHA with all the information they had requested.

45.    On September 7, 2017, Mr. Adelegan e-mailed Ms. Miller at DCPS asking whether there was any update with regard to his case. This time he was informed that Ms. Akbar at WOHA was on vacation, not to return until September 13, 2017. He remained in limbo.

46.    Between September 13 and 19, 2017, Mr. Adelegan attempted more than once to contact Ms. Akbar. On each such call, the secretary or receptionist for Ms. Akbar put him off, saying either that Ms. Akbar was out of the office that day or that she was at lunch. Hs repeated messages for her were never returned. During the same period Mr. Adelegan also e-mailed Ms. Miller asking whether there was any update, but received no response.

47.    On November 6, 2017, Mr. Adelegan received an e-mail from DCPS instructing him to submit to another fitness for duty examination. He promptly spoke with his doctor at Kaiser, who told him that she would insist that WOHA determine that he should be allowed back to work.

48.    Mr. Adelegan was able to schedule the newly required fitness for duty examination at WOHA for November 22, 2017, almost exactly a year after his first such examination. He appeared at WOHA for the examination on that date.

49.    At that examination, for the first time, Mr. Adelegan was asked whether he "used illegal substances." He replied no, because although in the past he had used marijuana,

that substance was legal to possess and use at all relevant times in Washington, D.C., where he lived.

50.     The WOHA physician informed Mr. Adelegan that she had spoken with his doctor at Kaiser, and that he should "answer the question truthfully" in order to return to work.

51.     Mr. Adelegan understood then that he was expected to tell WOHA that he had smoked marijuana in the past while off duty, even though the substance was legal, because his past use of marijuana had been a part of his medical history as reported to his doctor at Kaiser.

52.     Any past legal use of marijuana by Mr. Adelegan violated, and could by definition have violated, no DCPS policy, and did not warrant any DCPS disciplinary action against him.

53.     The WOHA physician then said that she would feel comfortable giving Mr. Adelegan approval to return to work only if he passed a drug test that day. Mr. Adelegan promptly took a urinalysis test at the WOHA office. The WOHA physician told him that she would call him if he failed the test, but that if he passed WOHA would simply forward the information to DCPS.

54.     From November 29 through December 6, 2017, Mr. Adelegan repeatedly telephoned WOHA in an effort to obtain the results of his urinalysis and/or confirmation of the favorable resolution of his fitness for duty. Each time WOHA claimed either that no doctor was available or that someone would be in touch with him.

55.     On December 6, 2017, Ms. Akbar of WOHA took one of his calls, and said that WOHA's information had been forwarded to DCPS and that he should contact them. She would not give him any further information.

56.     On the same day, December 6, 2017, Mr. Adelegan e-mailed Ms. Miller of DCPS to confirm that she had been given the results of his fitness for duty exam and to inquire about next steps. He received no response.

57.     On January 22, 2018, Mr. Adelegan received from DCPS, without explanation, a "Last Chance Agreement" that he was expected to sign, along with instructions to take another drug test for "rehire," and yet another medical release form for him to complete.

58.     The "Last Chance Agreement" was a document purporting to place Mr. Adelegan on the very edge of termination, such that the slightest perceived infraction would lead to his dismissal without recourse, as if previous lesser discipline had already been imposed.

59.     Mr. Adelegan took the additional drug test on January 23, 2018, but was unsure why he had to fill out yet another medical release form for DCPS, and was reluctant to sign the "Last Chance Agreement" given that it created the false impressions (a) that he had committed one or more infractions warranting discipline, (b) that he had received whatever graded disciplinary action would properly precede such an agreement, and (c) that he agreed that even the slightest infraction would now result in his immediate dismissal. Therefore, the next day, January 24, 2018, he contacted his union representative, Jacqueline Pogue-Lyons of the Washington Teachers' Union ("WTU"), and informed her of these developments.

60.     Ms. Pogue-Lyons invited Mr. Adelegan to WTU headquarters the next day to discuss the issues with WTU's outside counsel, Lee Jackson, Esq. Mr. Adelegan did so on January 25, 2018.

61.     Based on the advice of WTU counsel, Mr. Adelegan determined not to sign the agreement, because it surrendered procedural rights he otherwise retained, implicated him in misconduct he had not committed, created the pretense of fair disciplinary procedures that

had not been accorded him, and placed an imprimatur of legitimacy on the charade that DCPS had mounted in order to avoid giving a reason for his *de facto* termination. He so informed DCPS promptly.

62.     DCPS has not communicated with Mr. Adelegan about this matter since that day.

63.     Mr. Adelegan remained unpaid by DCPS, not formally terminated, not given any recourse to challenge the LCA, and not able to apply for unemployment compensation, until the principal of Burrville Elementary School, also a DCPS school, offered him a teaching position for the fall of 2018, which he accepted.

64.     DCPS treated Mr. Adelegan's formal application for the Burrville position as that of a new teacher who had never before worked at DCPS, and did not attempt to address or resolve the employment limbo in which it had kept him beginning in November 2016, or the deprivation of pay it had imposed on him beginning in September 2017.

65.     Mr. Adelegan began teaching at Burrville at the start of the 2018-19 academic year, and teaches there as of the date of this filing. His most recent performance evaluation rated him "highly effective." He has never received an explanation, back pay, or other compensation, from DCPS or any of its personnel for the wrongs described in this Complaint.

66.     As a result of the wrongs complained of herein, Mr. Adelegan has suffered substantial monetary loss, as well as severe and long-term emotional distress, harms to his reputation, his self-esteem, and his quality of life, and other adverse consequences to be proven at trial.

### Count I:
### Retaliation for expression protected by the federal Constitution

67.     The preceding allegations of this Complaint are incorporated herein in their entirety.

68.     Mr. Adelegan's Facebook livestream video posting of November 3, 2019, was protected personal speech on matters of significant public concern. It was uttered and posted while Mr. Adelegan was off duty. It was not official speech directed by his employer, was not uttered or posted within the scope of his employment, was not part of his normal job duties, and was not done on the employer's time. Its factual content was neither false nor erroneous, and it did not identify individuals, unnecessarily disclose sensitive, confidential or privileged information, or make disclosures outside the public's right to know.

69.     DCPS' actions against Mr. Adelegan following his Facebook posting were done in retaliation for his exercise of the right of free expression, in violation of the First Amendment to the United States Constitution.

70.     DCPS' directive, issued to Mr. Adelegan on November 15, 2019, that he undergo a "fitness for duty" mental health examination as a condition of returning to work, was in furtherance of a false pretense that Mr. Adelegan was mentally ill, designed and intended to deflect his permissible and protected public criticism of them, and to punish him for uttering it.

71.     In issuing to Mr. Adelegan the directive described in the preceding paragraph, and in pursuing the false pretense that he was mentally ill, DCPS retaliated against him for protected speech that the D.C. public school system, or some of its personnel, found embarrassing.

72.     In shifting pretexts from mental illness to another false pretense, that of past "illegal" drug use, and in insisting that he sign a "Last Chance Agreement" as a condition of returning to work, DCPS continued and compounded its retaliation against him for his protected speech.

73.     In cutting off Mr. Adelegan's pay beginning in September 2017, DCPS further retaliated against him for his protected speech.

74.     In and as a result of its wrongful conduct as described in this Complaint and in this Count, DCPS inflicted substantial financial harm and severe and permanent emotional distress on Mr. Adelegan, and substantially and permanently harmed his earning power, his reputation, his self-esteem and his quality of life.

75.     DCPS' wrongful conduct as described in this Complaint and in this Court was willful, deliberate and intentional, and therefore warrants the imposition of punitive damages.

### Count II:
### Denial of substantive due process under the federal Constitution

76.     The preceding allegations of this Complaint are incorporated herein in their entirety.

77.     In pursuing the false pretense that Mr. Adelegan was mentally ill, and requiring him to undergo unnecessary mental health examinations as a precondition of his return to work, DCPS infringed Mr. Adelegan's substantive rights against deprivation of liberty or property without due process of law under the Fifth Amendment to the U.S. Constitution.

78.     In requiring, as a condition of his returning to work, but without basis in fact or law, that Mr. Adelegan waive all physician-patient privilege as to all his private medical records, and all rights he may have had to keep those records from his employer under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), DCPS infringed Mr. Adelegan's substantive rights against deprivation of liberty or property without due process of law under the Fifth Amendment to the U.S. Constitution.

79.     In shifting its pretext for depriving him of work from his mental health to his past off-duty use of legal marijuana, which violated, and could by definition have violated, no

DCPS policy, DCPS infringed Mr. Adelegan's substantive rights against deprivation of liberty or property without due process of law under the Fifth Amendment to the U.S. Constitution.

80.    In requiring Mr. Adelegan to sign a "Last Chance Agreement," placing him on the extreme verge of termination, without basis, and without prior disciplinary action for which in any event there would have been no basis, DCPS infringed Mr. Adelegan's substantive rights against deprivation of liberty and property without due process of law under the Fifth Amendment to the U.S. Constitution.

81.    In suspending Mr. Adelegan's pay starting September 1, 2017, without basis, and without prior disciplinary action for which in any event there would have been no basis, DCPS infringed Mr. Adelegan's substantive rights against deprivation of liberty and property without due process of law under the Fifth Amendment to the U.S. Constitution.

82.    DCPS' wrongful conduct, as described in this Complaint and in this Count, deprived Mr. Adelegan of a year's salary, inflicted severe and permanent emotional distress on him, and substantially and permanently harmed his future earning power, his reputation, his self-esteem and his quality of life.

83.    DCPS' wrongful conduct as described in this Complaint and in this Court was willful, deliberate and intentional, and therefore warrants the imposition of punitive damages.

### Count III:
### *Violation of the D.C. wage theft statute*

84.    The preceding allegations of this Complaint are incorporated herein in their entirety.

85.    Beginning on September 1, 2017, DCPS, without terminating Mr. Adelegan's employment, completely cut off and ceased his pay without explanation.

86.    There was no employment justification for cutting off Mr. Adelegan's salary, nor was his employment officially terminated.

87.     By unjustly cutting off Mr. Adelegan's DCPS salary for the entirety of the 2017-18 academic year, as explained in this Complaint and in this Count, DCPS withheld and refused to pay Mr. Adelegan's lawfully earned wages in violation of the District of Columbia wage theft statute, D.C. Code § 32-1301 *et seq.*

88.     DCPS' wrongful conduct as alleged in this Complaint and in this Count was willful, deliberate, and done in bad faith, and requires the imposition of treble damages in addition to the unpaid wages under D.C. Code § 32-1308(a)(1)(A).

### *Prayer for relief*

89.     WHEREFORE, plaintiff Olusegun Adelegan respectfully requests as follows:

(a)     That this Court declare that the acts and omissions of the defendant, as alleged in this Complaint, violated his rights to freedom of expression and due process of law under the First and Fifth Amendments to the U.S. Constitution, and to lawful payment of wages due under D.C. Code § 32-1301 *et seq.*;

(b)     That this Court enter judgment awarding Mr. Adelegan compensatory damages against the defendant for his lost wages, for his emotional distress during and since the ordeal described herein, and for enduring harm to his reputation, self-esteem and quality of life, in an amount appropriate to the evidence adduced at trial;

(c)     That this Court declare that the defendant violated the D.C. wage theft statute, D.C. Code § 22-1301 *et seq.*, in stopping Mr. Adelegan's pay, and that it enter judgment awarding Mr. Adelegan wage theft damages in the amount of three times the back pay owed, in addition to the back pay itself, under D.C. Code § 32-1308;

(d)     That this Court declare that the defendant's conduct as alleged herein was willful, deliberate and intentional, and award Mr. Adelegan punitive damages;

(e)     That this Court enter judgment awarding Mr. Adelegan his costs and reasonable attorneys' fees in this action as provided by 42 U.S.C. § 1988 and D.C. Code § 32-1308(b);  and

(f)     That this Court grant Mr. Adelegan such further declaratory, injunctive and/or monetary relief as this Court may deem just and proper.

### Jury demand

90.   Plaintiff requests a trial by jury on all claims so triable.


Respectfully submitted,

_____
Stephen B. Pershing
D.C. Bar No. 482580
Pershing Law PLLC
1416 E Street, N.E.
Washington, D.C. 20002
(202) 642-1431 (o/m)
steve@pershinglaw.us

*Counsel for plaintiff*

Dated: November 14, 2019