**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| OLUSEGUN ADELEGAN, | |
| Plaintiff, | Case No. 19-cv-3440 (JMC) |
| v. | |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

Plaintiff Olusegun Adelegan brought this suit against the District of Columbia and its employees (collectively, Defendants), alleging denial of due process and retaliation after the District of Columbia Public Schools (DCPS) placed him on administrative leave for criticizing DCPS employees during a Facebook livestream video.[1] Defendants have moved to dismiss all of Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, seek summary judgment on his First Amendment retaliation claim. Because Plaintiff failed to exhaust administrative remedies required by law, the Court will **GRANT** the Government's motion to dismiss his substantive and procedural due process claims.[2] The Court will also **GRANT** the Government's motion to dismiss Plaintiff's First Amendment retaliation claim.

---

[1] The DCPS employees that Plaintiff names as Defendants are: Melody Miller, officer of the Office of Labor Management and Employee Relations, Erin Pitts, deputy chief of Labor Management and Employee Relations, Crystal Jefferson, chief of the Office of Talent and Culture, Marshall Cartland, principal of Wheatley Education Campus, Gene Pinkard, Instructional Superintendent, John Davis, interim chancellor, Antwan Wilson, chancellor, Amanda Alexander, interim chancellor, and John Doe, deputy chancellor. ECF 24-2 ¶¶ 5–13.

[2] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

## I.     BACKGROUND

### A.  Factual History

In the fall of 2016, Plaintiff was working for DCPS as a full-time instructional coach, i.e., a "teacher who helped other teachers with their instruction." ECF 24-2 ¶ 16. He had previously worked at Wheatley Education Campus in northeast D.C. for the 2015–16 school year and returned for the 2016–17 school year. *Id.* ¶ 3. On November 3, 2016, Plaintiff went to his assigned school while recording a livestream video broadcasted on Facebook. *Id.* ¶ 17. While recording, Plaintiff alleges that he made statements "critical of his school's disservice to its students, and of the role of its administrators and staff in that disservice." *Id*.

Specifically, Plaintiff posted an approximately twenty-four minute video on Facebook Live.[3] He is visibly agitated and his statements are laced with profanity. The video begins with Plaintiff addressing one of his former students, saying "Oh they not ready for this but we got this s*** on Facebook Live. I picked up my young boy off the street, [name]. [Name], say hello to Facebook. F*** them all though. They don't give a f*** about you, [name]. They don't give a f*** about me. All right? Because if they gave a f*** about [name], they would have done better by [name] when he went to this school, but they didn't. They ain't do right by all these kids." Defendants' Exhibit B at 0:28–0:50. He criticizes the school because the students who he had in his class during his first year of teaching were not scoring proficiently on standardized testing and credits himself with improving their performance. *Id.* at 1:00–1:30. He then says, "open up the f****** door, Wheatley Education Campus, before I get crazy." *Id.* at 1:30–1:36.

---

[3] Defendants submitted the video as an exhibit to the Court. ECF 27-1 at 1 (describing "Exhibit B" as a "Video Recording of Facebook Live Broadcast Record"). The video and a transcript of the video were both filed under seal to protect the identities of the children involved. *Id.* at 2. The Court discusses the content of Plaintiff's speech in this unsealed opinion but does not name or identify any of the children.

After complaining about not being let into the school, he says, "I just want all the kids that I used to teach, come up to the school right now. If I used to teach you, . . . come to the school. Because we 'bout to expose everything that goes on at Wheatley and we're going to change this s*** for the better." *Id.* at 1:50–2:09. He complains more about the school not opening the door: "They don't even want to open up the door for me. That's f***** up. I done put five years into this m************ school and I'm not a crazy dude. I'm not even about to wild out, I'm just about to tell the truth." *Id.* at 2:11–2:24. He calls out to his former student again: "[Name], you see this fake s***?" *Id.* at 2:25–2:27. He expresses concern that someone will call the police and says "the police already don't like me right now," *id.* at 2:35–2:38, and threatens to "call the news up here," *id.* at 3:16–3:17. He names people who work at the school and says "y'all won't face me as men." *Id.* at 3:30–3:35. He repeatedly calls out to the kids he used to teach: "All my kids come up to the m************ school, we turning up." *Id.* at 4:30–4:33.

Plaintiff then leaves the school and gets back in his car. *Id.* at 5:34–5:37. He starts driving, *id.* at 6:20, while saying, "f*** everybody who ruins kids' lives," *id.* at 6:22–6:23. While driving around, he says, "I'm not a mad man, I'm speaking the truth. I don't have no strap on me, and even if I did . . . ." *Id.* at 6:45–6:56. He then trails off and asks someone outside the car, "why's the school on a lockdown?" *Id.* at 6:56–6:57. He again says, "all my old kids, come to Wheatley." *Id.* at 7:26–7:28. He starts talking to some kids who get in the car. "Hey, what up? . . . Get your a**** in the backseat, I'm dropping y'all off." *Id.* at 7:53–8:02. He appears to acknowledge that the school might be locked down because of him: "I think the school is on a lockdown or something. I thought it was because of me, but it might not be. There might be something else going on." *Id.* at 8:17–8:24.

He then returns to talking to his Facebook Live audience and says "back in the back I got two students." *Id.* at 8:38–8:42. He clarifies that they were not his students, but "my girl's old students . . . they was in third grade in 2012, so I've known them for a very long time. You know what, Wheatley's failed them too even though they left Wheatley." *Id.* at 8:47–9:00. He asks the students to go home and "let your mom or whoever know, I need y'all to let them know everything about what goes on at Wheatley, all the s*** that goes on." *Id.* at 9:17–9:25. He then says "we gon change the school, we gon change the principal, either I'm going to be the principal or they're going to bring a new principal. Mr. Cartland ain't gonna be principal no more. He don't know how to handle y'all. I know how to handle y'all." *Id.* at 9:29–9:38. He then tells the girls that "I love you all from the bottom of my heart." *Id.* at 9:40–9:42.

Off camera, the girls appear to exit the vehicle. *Id.* at 10:02–10:06. He then starts talking to a student out of his car window, saying "I'm sorry I quit on you all. I can't do it anymore, man. It's just a terrible school. Man, you know Scott Cartland ain't doing what he got to do for y'all. So what y'all going to do? Y'all going to go home and just tell your parents everything real that's going on in this school." *Id.* at 10:32–10:44. He tells the students, "at the end of the day, I'm about y'all learning. I'm not coming back until Mr. Cartland is gone." *Id.* at 11:53–11:57. After a student drew a penis on his window, he says, "I've never been happier to see a penis," *id.* at 12:19–12:20, but proceeds to tell the child to "erase that penis you drew on my window before I beat you like you stole something," *id.* at 12:30–12:37. He then says, "I got four of my students. I need more of my students to come." *Id.* at 13:23–13:26.

Plaintiff starts driving around the school again, where he encounters a police officer and says "we need to report something that's going on at Wheatley." *Id.* at 14:25–14:27. The officer asks him to pull over, *id.* at 14:28–14:29, and he refuses, saying he has to go to another school and

4

that he works for the D.C. government. *Id.* at 14:29–14:35. He tells the officer, "Look, there was a rape that went on last year that wasn't reported to the proper authorities. Scott Cartland knows about it. There's a gentleman in there who is guilty of the crime with an eighth-grade student. They know about it. I told him yesterday he had until 3:30 to expose it because it's been eating at my soul and I've been so patient but so upset." *Id.* at 14:35–14:55. The officer asks if Plaintiff worked at the school and Plaintiff says he "used to" but quit the day before. *Id.* at 14:56–14:59. The officer asks if he can pull over to give her more information, but Plaintiff says he'll "talk to [her] later" and he doesn't feel well. *Id.* at 15:06–15:15. The officer says that if he is going over to Browne (another D.C. school that Plaintiff indicated he was heading to), she can meet him over there, and Plaintiff agrees. *Id.* at 15:54–16:06.

After he drives away from the police officer, Plaintiff says, "The cops f****** with me because I told the truth. I ain't no b**** and I ain't called a snitcher." *Id.* at 16:18–16:24. He then says, "I'm all about protecting young lives." *Id.* at 16:32–16:34. He speculates some more about why there's a lockdown at Wheatley and complains about his treatment by cops and the Black Lives Matter movement. *Id.* at 17:58–19:03. He says that, if nobody cares, he should be "hitting . . . up" students as well, giving them his number or flirting with them. *Id.* at 19:06–19:25. He also resumes his rant against the school leadership. "If I'm a leader and I know about that, right? I ain't doing nothing about that, right? I don't call the popo, right? I don't fire them, right? I see terrible shit going on in schools, I don't lead the kids, right?" *Id.* at 19:27–19:43. He later says, "If we don't protect these kids, we'll fall for anything. There was a rape that happened at my school last year and my principal did not report it through the appropriate channels. Now I'm asking for his resignation. I'm sorry. I can't live like this no more. He got to go." *Id.* at 20:54–21:12. He then says "you can't have no m************ white person leading Wheatley Education Campus while

5

Wheatley Education Campus is still f****** black, b******." *Id.* at 21:28–21:39. He again reiterates that "Scott Cartland should be fired. He needs to resign because he allowed a rape to happen on Wheatley's campus and he didn't do s*** about it." *Id.* at 22:00–22:06.

Finally, Plaintiff gets out of his car and appears to be walking in a parking lot. An individual approaches Plaintiff, telling him to "turn around" and "walk." *Id.* at 22:24–22:28. Plaintiff begins crying and the individual reassures him. *Id.* at 22:34–22:38. Plaintiff then says, "I'm so tired of all this shit, man. He raped the kids and they let him stay. He let him work there. He didn't fire him. He didn't report it to the police. They had to be quiet because they expect to be quiet. They are going to fire me too." *Id.* at 23:11–23:24. Another individual—seemingly a police officer—tries to reassure him, but Plaintiff says, "My career is over. I did everything for these kids." *Id.* at 23:25–23:33; ECF 24-2 ¶ 24 (complaint stating that Plaintiff was met outside Browne by two police officers). The video ends with Plaintiff being accompanied by the police, saying, "I gave them my blood, I gave them my sweat, I gave them my tears. I'm done with education. I'm done with education." Defendants' Exhibit B at 23:36–23:45.

According to the complaint, at this point, D.C. Metropolitan Police Department officers took Plaintiff against his will to the D.C. General Hospital, where he was "told he must undergo a psychological examination." ECF 24-2 ¶¶ 21–24. Plaintiff was released shortly after because the psychiatric program at the hospital concluded that he was not mentally ill, deranged, or disturbed, and did not pose a threat to himself or others. *Id.* ¶ 26. That same day, Plaintiff received an email from Defendant Erin Pitts, deputy chief of the Office of Labor Management and Employee Relations at DCPS, informing him that he had been placed on administrative leave with pay. *Id.* ¶ 28. Prior to being permitted to return to work, one or more Defendants told Plaintiff that he would be required to complete a "fitness for duty examination." *Id.* ¶ 29. Plaintiff attempted to do so on

6

January 3, 2017 by meeting with a mental health professional that DCPS's contractor, Washington Occupational Health Associates (WOHA), assigned to him. *Id.* ¶ 34. During the appointment, a psychiatrist told Plaintiff that WOHA would forward DCPS the results of the examination. *Id.* From that appointment until April 20, 2017, Plaintiff had no contact with DCPS. *Id.* ¶ 35. Then, on April 20, Defendant Melody Miller, an officer of DCPS's Office of Labor Management and Employee Relations, asked Plaintiff to "release his complete behavioral health records" including his "drug and alcohol screenings." *Id.* Plaintiff hand-delivered the requested records to WOHA and informed DCPS that he "signed a release" to allow WOHA to contact his therapist. *Id.* ¶ 37.

Following these communications, Plaintiff reached out to DCPS and WOHA on several occasions to inquire as to his next steps. *Id.* ¶¶ 38–43. In July 2017, Miller informed Plaintiff that "if he gave DCPS a letter from his treating doctor . . . stating that he was fit for duty, DCPS would find it acceptable." *Id.* ¶ 43. Plaintiff attempted to obtain that letter during July and August 2017 but encountered various delays, including procuring a "fitness for duty" form from DCPS and transmitting a release form between his psychiatrist and WOHA. *Id.* ¶¶ 44–53.

On September 1, 2017, Plaintiff did not receive his direct deposit as scheduled. *Id.* ¶ 54. Plaintiff "was not told that he had been terminated, or that an investigation of him had occurred or had concluded." *Id.* Throughout September, Plaintiff attempted to contact WOHA and Ms. Miller but did not receive any response. *Id.* ¶ 59. On November 6, 2017, "one or more of the DCPS defendants" asked Plaintiff to complete another fitness for duty examination. *Id.* ¶ 60. Plaintiff did so on November 22, 2017. *Id.* ¶ 62. During this appointment, the WOHA physician asked Plaintiff whether he was "using illegal substances." *Id.* ¶ 63. Plaintiff denied doing so but the WOHA physician said she had spoken with his other doctor and "that he should answer the question truthfully in order to return to work." *Id.* ¶¶ 63–64. Plaintiff "understood then that he was expected

7

to tell WOHA that he had smoked marijuana in the past" because he had reported his past usage to his other doctor. *Id.* ¶ 65. The WOHA physician then asked Plaintiff to take a drug test and told him that if he failed, he would receive a call, but, if he passed, the results would be forwarded to DCPS. *Id.* ¶ 68.

After taking the drug test, Plaintiff did not receive word of his results from either WOHA or DCPS. *Id.* ¶¶ 69–71. On January 22, 2018, DCPS sent Plaintiff a "Last Chance Agreement" which provided conditions of "rehire," including another drug test and another medical release form. *Id.* ¶ 72. Plaintiff complied with the request for another drug test but contacted his union prior to signing the "Last Chance Agreement." *Id.* ¶ 75. After consulting with his union, Plaintiff decided not to sign the agreement and informed DCPS promptly. *Id.* ¶ 77. That was the last communication Plaintiff had with DCPS in that matter. *Id.* ¶ 78. Plaintiff contends that he remains "unpaid" for the period that he was on leave after September 1, 2017 despite "not [being] formally terminated" by DCPS. *Id.* ¶¶ 79–80. Without resolving his dispute with DCPS about his employment at Wheatley, Plaintiff accepted an offer for a teaching position at Burrville Elementary School, another DCPS school, for the fall of 2018. *Id*.

### B. Procedural History

The operative complaint represents Plaintiff's second attempt to amend his claims and allegations following Defendants' motions to dismiss. ECF 24-2. Plaintiff's second amended complaint states three causes of action. The complaint alleges that Defendants (1) retaliated against Plaintiff in violation of the First Amendment; (2) denied him substantive due process in violation of the Fifth Amendment; and (3) denied him procedural due process in violation of the Fifth Amendment. *Id.* ¶¶ 99–126. Defendants have moved to dismiss Plaintiff's second amended

8

complaint in its entirety, or in the alternative, for summary judgment on Plaintiff's First

Amendment retaliation claim. ECF 26.

## II.    LEGAL STANDARD

Defendants moved for dismissal of all claims under Rule 12(b)(6), and the Court grants the

motion on that basis. Under Rule 12(b)(6), a complaint must allege facts sufficient to "state a claim

to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The

Court must "treat the complaint's factual allegations as true" and afford the plaintiff "the benefit

of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*,

216 F.3d 1111, 1113 (D.C. Cir. 2000). "In deciding a motion to dismiss, a court may . . . consider

documents attached to or incorporated in the complaint," *He Depu v. Yahoo! Inc.*, 950 F.3d 897,

901 (D.C. Cir. 2020), as well as "documents upon which the plaintiff's complaint necessarily

relies[,] produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss,"

*Munro v. LaHood*, 839 F. Supp. 2d 354, 359 (D.D.C. 2012).

## III.    ANALYSIS

Plaintiff brings three claims in his section 1983 suit: (1) First Amendment retaliation, (2)

substantive due process, and (3) procedural due process. ECF 24-2 ¶¶ 99–126. Relevant to this

opinion, Defendants assert two grounds for dismissal.[4] First, Defendants contend Plaintiff failed

to exhaust his administrative remedies for all claims, which they suggest both divests the Court of

subject matter jurisdiction and constitutes a failure to sufficiently plead the cause of action.

---

[4] Defendants also raise grounds for dismissal that the Court does not reach in this opinion, including moving to dismiss Plaintiff's claim against the District of Columbia because Plaintiff has not pled a viable *Monell* claim, *id.* at 17–23, moving to dismiss Plaintiff's due process claims for failure to state a claim, *id.* at 23–29, and asserting qualified immunity on behalf of Defendant Melody Miller, *id.* at 38–41.

9

ECF 26-1 at 6–16. In the alternative, Defendants have asked the Court to dismiss or enter summary judgment in their favor on Plaintiff's First Amendment claim.[5] *Id*. at 30–37.

Finding it has subject matter jurisdiction over the claims, the Court considers Defendants' motion under Rule 12(b)(6). Because Plaintiff was required to plead administrative exhaustion as a prerequisite to bringing his due process claims and did not do so, the Court grants Defendants' motion to dismiss those claims. The Court finds that Plaintiff was not required to exhaust his First Amendment claim, but determines that he has separately failed to state that claim on the merits and also dismisses that claim.

---

[5] The Court understands Defendants as moving to dismiss Plaintiff's First Amendment claim for failure to state a claim and, in the alternative, for summary judgment. ECF 26-1 at 3–4 ("Point IV establishes, based on Plaintiff's Facebook Live broadcast, that no reasonable jury could find that Plaintiff engaged in speech protected by the First Amendment, or that the District's actions against Plaintiff were made in retaliation for protected speech. Therefore, even if Plaintiff had pleaded viable constitutional claims under *Iqbal* and *Twombly*, these claims are ripe for summary judgment."). Plaintiff, however, appears to recognize that the Court could consider the video as "part and parcel of the complaint" at the motion to dismiss stage, making it unnecessary to convert Defendants' motion to one for summary judgment. *See* ECF 29 at 12 (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

   The Court sees no need to convert Defendants' motion to dismiss into a motion for summary judgment in assessing the First Amendment claim. At the motion to dismiss stage, the Court can consider, in addition to "the facts alleged in the complaint," any "documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 54 (D.D.C. 2016). Plaintiff alleges that he "recorded and posted a Facebook livestream video that was critical of his school's disservice to its students, and of the role of its administrators and staff in that disservice." ECF 24-2 ¶ 17. The contents of that speech, then, are at the very heart of his complaint and are incorporated by reference therein. The Court will therefore construe Defendants' motion as a motion to dismiss Plaintiff's First Amendment claim under Federal Rule of Civil Procedure 12(b)(6) and apply that standard. The Court notes that even if it considered Plaintiff's claim under a summary judgment standard, it would reach the same result because Plaintiff cannot show his First Amendment rights were violated for the reasons the Court will explain later. *See infra* Section III.B; *Sanders v. District of Columbia*, 85 F. Supp. 3d 523, 534 (D.D.C. 2015) (granting summary judgment to defendants where plaintiff's speech was part of "reporting conduct that interfered with his job responsibilities" and "therefore was unprotected by the First Amendment").

   Referring to the transcript, Plaintiff suggests that Defendants "quote selectively from" the video and "introduce interpretations of fact," ECF 29 at 12. But Plaintiff acknowledges the authenticity of the video exhibit submitted. Although the transcript Defendants submit with their briefing is a useful aid, the Court can ascertain the content of Plaintiff's speech from the video itself. The Court only considers Plaintiff's words and does not draw inferences or interpret his statements beyond the words that he utters. Accordingly, the Court finds it appropriate to consider the video in connection with Defendants' motion to dismiss without considering Defendants' alternative request for summary judgment.

## A. Administrative Exhaustion

Defendants argue Plaintiff's suit requires exhaustion of the administrative remedies made available to Plaintiff under the District's Comprehensive Merit Personnel Act (CMPA) and that Plaintiff's failure to exhaust bars his claims.[6] ECF 26-1 at 3 (stating that "Plaintiff failed to exhaust his administrative remedies, which defeats his three claims"). Plaintiff responds that the CMPA presents no jurisdictional barrier to suit in federal court, and thus the Court has discretion to consider his claims. ECF 29 at 1–3.

The Court begins by finding that the CMPA exhaustion requirement applies to both of Plaintiff's due process claims, but not his First Amendment claim. And for those claims subject to the exhaustion requirement, although it is nonjurisdictional, Plaintiff was nonetheless required to plead that he had exhausted his administrative remedies before filing suit in federal court. Because Plaintiff has not done so, and he has failed to demonstrate that exhaustion would have been futile, the Court finds that Plaintiff has failed to state his due process claims and dismisses them accordingly.

### 1. Overview of the CMPA

When the D.C. Council enacted the CMPA, D.C. Code § 1–601.01 *et seq*., it intended to create a "uniform system of merit personnel administration that would replace a disjointed, decentralized, and inefficient federal framework." *Amobi v. Brown*, No. 08-cv-1501, 2021 WL 3722710, at *4 (D.D.C. Aug. 23, 2021); *see* D.C. Code § 1–601.02(a)(2) (describing the creation of "uniform systems for personnel administration among the executive departments and agencies"

---

[6] Defendants' motion to dismiss states that "all three" of Plaintiff's claims are "preempted by the CMPA," but in reply, Defendants appear to suggest that only Plaintiff's due process claims should be dismissed for failure to exhaust. *Compare* ECF 26-1 at 9, *with* ECF 30 at 2 ("Plaintiff's due process claims (Counts II and III) should also be dismissed because Plaintiff failed to exhaust his administrative remedies."). Because their initial motion to dismiss contains language that suggests they are seeking to dismiss all three claims for failure to exhaust, including the First Amendment claim, the Court briefly explains below why it rejects that argument as to Plaintiff's First Amendment claim. *See infra* Section III.A.2.

11

in the District government). The CMPA "provides a remedy for the majority of employment related conflicts that occur between the District of Columbia and its employees" and covers employee complaints "arising out of employer conduct in handling personnel ratings, employee grievances, and adverse actions." *Greer v. Bd. of Tr. of Univ. of Dist. of Columbia*, 734 F. Supp. 3d 75, 80 (D.D.C. 2024). With limited exceptions, the D.C. Court of Appeals has recognized the CMPA as the "exclusive remedy for a District of Columbia public employee who has a work-related complaint of any kind." *Robinson v. District of Columbia*, 748 A.2d 409, 411 (D.C. 2000); *see also District of Columbia v. Thompson*, 593 A.2d 621, 635 (D.C. 1991) (same). Employees of the D.C. public schools, like Plaintiff, are subject to the CMPA, which Plaintiff has not disputed. *See* ECF 29 (no legal argument on this point); *see also* D.C. Code § 1–602.01(a) (CMPA applies to "all employees of the District of Columbia government" with very limited exceptions); *Dickerson v. District of Columbia*, 806 F. Supp. 2d 116, 121 (D.D.C. 2011) (finding the CMPA applied to DCPS employees); *Grivnow v. Bowser*, No. 20-cv-2000, 2022 WL 4130838, at *1, 3–4 (D.D.C. Sept. 12, 2022) (same).

Under the CMPA, employees can challenge "any matter under the control of the District government which impairs or adversely affects the interest, concern, or welfare of employees" by filing a grievance, D.C. Code § 1–603.01(10); *see also id.* § 1–616.53, or they can contest an adverse action involving "removal, a reduction in grade, or suspension of 10 days or more" by filing an appeal with the D.C. Office of Employee Appeals (OEA), *id.* § 1–616.52(b). An employee may appeal to the OEA or use any grievance procedure set out in an applicable collective bargaining agreement (CBA), "but not both." *Id.* § 1–616.52(e). If an employee chooses the applicable CBA grievance procedure, its provisions "take precedence over" the statutory procedure. *Id.* § 1–616.52(d). Depending on the employee's chosen course of action, they are

12

statutorily authorized to seek judicial review by the D.C. Superior Court. An OEA decision is directly appealable to the D.C. Superior Court, *id.* § 1–606.03(d), while an arbitration award under a CBA grievance procedure is appealable to the Public Employees Relations Board, *id.* § 1–605.02(6), and then to the D.C. Superior Court, *id.* §§ 1–605.02(12), 1–617.13(c); *see also Thompson,* 593 A.2d at 634 (noting that the CMPA contemplates a "reviewing role for the courts as a last resort, not a supplementary role for the courts as an alternative forum").

Plaintiff's claims regard Defendants' conduct in placing him on administrative leave starting in November 2016, which he characterizes in his complaint as "effectively a disciplinary suspension." ECF 24-2 ¶¶ 28–30. After months of back and forth regarding the terms of his return to work, and his refusal to sign the "Last Chance Agreement," Plaintiff alleges he was "*de facto*" terminated. *Id.* ¶¶ 75, 77. These claims concern alleged adverse actions that clearly fall under the CMPA's scope. *See* D.C. Code § 1–606.03(a) ("An employee may appeal . . . an adverse action for cause that results in removal, . . . placement on enforced leave, or suspension for 10 days or more . . . to the Office [of Employee Appeals]."); *see also Johnson v. District of Columbia*, 552 F.3d 806, 807–08 (D.C. Cir. 2008) (affirming the district court's dismissal where employee failed to exhaust CMPA's administrative remedies for grievances related to being placed on administrative leave); *Greer*, 734 F. Supp. 3d at 82 (where a plaintiff's claims related to the reasons for his termination, the court held they required administrative exhaustion under the CMPA). And finally, "[i]f there is any question as to whether the CMPA applies, the plaintiff is still required in the first instance to invoke the CMPA's procedure because the determination whether the OEA has jurisdiction is quintessentially a decision for the OEA to make in the first instance." *Owens v. District of Columbia*, 923 F. Supp. 2d 241, 249 (D.D.C. 2013). Because Plaintiff is covered by the CMPA and his claims involve adverse actions related to administrative leave and what he describes

as a de facto termination, he is required by D.C. law to exhaust his administrative remedies. D.C. Code § 1-616.52(b).

### 2. Plaintiff Was Not Required to Exhaust His First Amendment Claim But Must Exhaust His Constitutional Due Process Claims.

Plaintiff contends that administrative exhaustion is not required because his three claims—First Amendment retaliation, substantive due process, and procedural due process—are constitutional and thus outside the scope of the CMPA. ECF 29 at 1–3. The Court finds that his constitutional due process claims are subject to the exhaustion requirement but agrees that he does not need to exhaust the CMPA's administrative remedies to bring his First Amendment claim in this Court.

In *Patsy v. Board of Regents*, the Supreme Court established a default rule that Congress did not intend for section 1983 claims involving constitutional rights to be initially addressed through state administrative procedures. 457 U.S. 496, 500–01 (1982) ("[E]xhaustion is not a prerequisite to an action under § 1983."). But "when an alleged constitutional violation is intertwined with a statutory one, and [the legislature] has provided machinery for the resolution of the latter, the plaintiff must exhaust [his] administrative remedy before the district court may hear [his] case." *Nat'l Treasury Emps. Union v. King*, 961 F.2d 240, 243 (D.C. Cir. 1992). This requirement applies "when the statutory and constitutional claims are premised on the same facts." *Id.* While district courts have allowed, for example, "claims of workplace discrimination," to proceed without CMPA exhaustion, *Dickerson v. District of Columbia*, 70 F. Supp. 3d 311, 320 (D.D.C. 2014), they have determined that allegations of due process violations based on a failure to follow termination procedures are statutory claims and require exhaustion under the CMPA, *see, e.g.*, *Washington v. District of Columbia*, 538 F. Supp. 2d 269, 278 (D.D.C. 2008).

Here, Plaintiff's due process claims "fall within the CMPA jurisdiction . . . [because] they are essentially state law claims that the plaintiff[] construed in a constitutional light so as to seek federal court jurisdiction." *Owens*, 923 F. Supp. 2d at 248; *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 79 (D.D.C. 2007) (noting that plaintiffs cannot "use a constitutional hook to reel their CMPA-precluded claims into" federal court). Plaintiff's constitutional due process claims clearly fall under the CMPA bar. ECF 24-2 ¶¶ 108–26. His substantive due process claims allege that DCPS infringed upon his substantive rights in "requiring him to undergo unnecessary mental health examinations," forcing him to "waive all physician-patient privilege as to all his private medical records," and other actions Defendants took in terminating his employment. *Id.* ¶¶ 108–17. He alleges that these actions "violated his substantive rights against deprivation of liberty and property without due process of law" under the Fifth Amendment. *See, e.g.*, *id.* ¶ 113. His procedural due process claims rely on the same factual bases to allege that Defendants failed to provide him with the constitutional minimum of process that "they were required to afford him" under the applicable labor agreement and employee policies. *See, e.g.*, *id.* ¶ 120. He also claims that he was deprived of his constitutionally protected property interest in his employment. *Id.* ¶ 87.

But "[i]f a D.C. employee believes that he or she has been deprived of a property interest in continued employment without due process . . . that individual must exhaust all administrative remedies prior to filing suit in federal court." *Hoey v. District of Columbia*, 540 F. Supp. 2d 218, 230 (2008). Plaintiff's claims turn on his work-related gripes against the District—the District's process for putting him on leave and the requirements they allegedly imposed on his return to work. The question of whether Plaintiff was provided adequate process, then, necessarily turns on a determination about what process the District is obligated to provide employees in his situation, including whether it was appropriate under the circumstances to give Plaintiff a "Last Chance

15

Agreement" or to require him to undergo a mental health evaluation. *See* ECF 24-2 ¶¶ 108–26 (Plaintiff's allegations describing DCPS's "wrongful conduct" in suspending his pay and terminating him). Because of the nature of these claims, the OEA has primary jurisdiction to resolve them. *Washington*, 538 F. Supp. 2d at 278–79; *see* D.C. Code § 1-616.52(b) (allowing appeals of "removal[s]" and "suspension[s] of 10 days or more" to be made to the OEA). Such "constitutional" claims must be remedied pursuant to the CMPA because they are "intertwined" with Plaintiff's "remedies under the CMPA for termination," *Washington*, 538 F. Supp. 2d at 277, given that they regard Defendants' "conduct in handling . . . employee grievances[] and adverse actions," *Thompson,* 593 A.2d 621 at 635, and because they challenge the "procedural safeguards" provided to District employees, *Owens*, 923 F. Supp. 2d at 251; *see also Lucas v. U.S. Gov't*, 268 F.3d 1089, 1094 (D.C. Cir. 2001) (stating that litigants "cannot avoid exhaustion requirements by raising garden-variety work-related grievances as statutory and constitutional claims"). If the Court were to rule on his claims, it would be "prejudg[ing] local procedural questions" that properly belong in the D.C. administrative process. *Washington*, 538 F. Supp. 2d at 277. Accordingly, the Court finds that the CMPA exhaustion requirement applies squarely to Plaintiff's two due process claims.

Next, applying the same rule, the Court rejects Defendants' argument that administrative exhaustion bars Plaintiff's First Amendment claim. Defendants have not plausibly articulated why Plaintiff's First Amendment claim is a disguised statutory claim, as opposed to alleging a violation of a constitutional right. *See, e.g.*, *Am. Fed. of Gov't Emps. v. District of Columbia*, No. 05-cv-472, 2005 WL 1017877, at *5 (D.D.C. May 2, 2005) (finding that plaintiff was not required to undergo CMPA exhaustion before bringing a First Amendment claim for viewpoint discrimination). Defendants cite cases involving exhaustion of First Amendment claims in other

statutory schemes, including Federal Labor Relations Authority proceedings, without explaining how such authority sheds light on the CMPA requirement. *See Nat'l Treasury Emps. Union*, 961 F.2d at 244 (holding that administrative exhaustion may still be required even where plaintiffs assert First Amendment injury). Unlike his other claims, Plaintiff's First Amendment retaliation claim does not focus on contesting any of the procedures in the termination or suspension of his employment but challenges whether such actions took place *because of* his protected speech—which suggests that *Patsy*'s default rule that constitutional claims fall outside of the state administrative process applies. Without making explicit holdings about the interaction between the First Amendment and the CMPA, other courts in this district have addressed employees' First Amendment claims on the merits, while dismissing due process claims for failure to exhaust under the CMPA. *Sanders v. District of Columbia*, 85 F. Supp. 3d 523, 532–33, 537–38 (D.D.C. 2015) (dismissing procedural due process claim for failure to exhaust under the CMPA while evaluating plaintiff's First Amendment retaliation claims under a summary judgment standard); *Alexis v. District of Columbia*, 44 F. Supp. 2d 331, 343, 346–47 (D.D.C. 1999) (noting that a plaintiff "was obligated to obtain an OEA Final Decision on his due process claim before seeking judicial relief," while addressing another plaintiff's First Amendment retaliation claim on the merits). The Court adopts the same approach here and addresses Plaintiff's First Amendment claim on the merits below. *See infra* Section III.B.

### 3. Plaintiff Failed to Plead Exhaustion as an Element of His Due Process Claims

Having established that Plaintiff was required to exhaust administrative remedies under the CMPA for his due process claims, the Court now examines Defendants' argument that this exhaustion requirement is jurisdictional in this Court and concludes that it is not. *Cf.* ECF 26-1 at 16 (asking the Court to dismiss "for lack of subject matter jurisdiction"). Nonetheless, the Court

17

finds that Plaintiff was required to plead exhaustion in bringing his due process claims in federal court given that this case involves claims that fall under the CMPA administrative scheme.

Courts in this jurisdiction have distinguished between two types of exhaustion requirements. First, nonjurisdictional exhaustion is a "judicially created doctrine requiring parties who seek to challenge agency action to exhaust available administrative remedies before bringing their case to court." *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004). The second type of exhaustion is "jurisdictional exhaustion" which is a mandatory requirement that is "rooted, not in prudential principles, but in Congress' power to control the jurisdiction of the federal courts." *Id.* Jurisdictional exhaustion, as the name suggests, limits the court's subject matter jurisdiction to consider the claim in the first instance, but nonjurisdictional exhaustion does not. *Amobi*, 2021 WL 3722710, at *5–7.

In D.C. state courts, CMPA exhaustion is jurisdictional, *Robinson*, 748 A.2d at 411 n.4, but courts in this district have found that it is a nonjurisdictional requirement in federal court, *Washington*, 538 F. Supp. 2d at 275 (noting that state administrative exhaustion requirements in federal courts are treated as "prudential doctrine[s] exercised as a matter of judicial discretion"). That is because "the CMPA is a law that was enacted by a local legislature, and it is a bedrock principle of federal-court jurisdiction that, within constitutional bounds, *Congress* decides what cases the federal courts have jurisdiction to consider . . . and under what conditions federal courts can hear them." *Amobi*, 2021 WL 3722710, at *7; *Da 'Vage v. D.C. Hous. Auth.*, 583 F. Supp. 3d 226, 240 (D.D.C. 2022) ("[T]he Court is convinced that the CMPA does not deprive federal district courts of subject-matter jurisdiction to consider federal due process claims asserted by D.C. government employees."); *see also Johnson*, 552 F.3d at 810 n.2 (leaving undecided whether the CMPA exhaustion requirement is "better understood as jurisdictional or nonjurisdictional in

federal court"). As both parties agree, nonjurisdictional exhaustion is "prudential" and courts can excuse a plaintiff's failure to exhaust if they find that "the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992). But in a case involving a requirement to exhaust state administrative remedies, federalism and comity considerations arise, tilting the scales in favor of requiring exhaustion when such claims are brought in federal court. *Johnson v. District of Columbia*, 368 F. Supp. 2d 30, 43 (D.D.C. 2005), *aff'd*, 552 F.3d 806 (D.C. Cir. 2008). As another court in this district has written, "the D.C. Courts' application of the CMPA's exhaustion requirement as a jurisdictional rule militates strongly in favor of strictly enforcing that requirement here." *Id*. Failure to enforce the exhaustion requirement "would trample on the clearly expressed will of the Council of the District of Columbia" and undermine "the balance of power between the state and federal governments." *Id*.

Accordingly, federal courts in this district have required plaintiffs to exhaust under the CMPA by treating exhaustion, not as a jurisdictional requirement, but as "a necessary precondition" to judicial review. *Johnson*, 368 F. Supp. 2d at 36. Plaintiff's failure to exhaust, "then, constitutes a failure to sufficiently plead a necessary element of a federal cause of action." *Washington*, 538 F. Supp. 2d at 275; *Amobi*, 2021 WL 3722710, at *6 (stating that if the exhaustion requirement is nonjurisdictional, it "is treated as an element of the underlying claim"). Plaintiff's complaint leaves no question that he did not exhaust his administrative remedies. He makes no allegation in his complaint that he ever made any attempt to engage with the CMPA processes—either by filing an appeal to the OEA or invoking the CBA grievance procedure—nor that a final decision was reached through either process. *See* D.C. Code § 1–616.52 (requiring appeals of personnel decisions or grievances to be made to the OEA or through

19

a CBA grievance procedure); *id.* § 1–606.03(c) (stating that "[a]dministrative remedies are considered exhausted when a decision becomes final in accordance with" D.C. law governing petitions for review to the OEA). Indeed, the complaint's allegations make clear that he did *not* exhaust administrative remedies, because he alleges that, at the time of filing, he had not had any further contact with Defendants about this matter after declining to sign the Last Chance Agreement. ECF 24-2 ¶ 78. His complaint thus suggests that he did not engage with Defendants through any CMPA administrative process. And his complaint also explains why he believes that he did not need to go through the process—because according to Plaintiff, he is suing the District under precedent that "exempt[s] most constitutional claims by government employees from the requirement that administrative procedures . . . be exhausted before or rather than filing suit." *Id.* ¶ 4; *see also* ECF 29 at 3 (acknowledging that Plaintiff did not exhaust administrative remedies and offering to "amend his complaint, if the Court wishes, to allege expressly that his 'recourse' to the CMPA would have been futile"). Because Plaintiff's complaint makes clear that he did not exhaust his administrative remedies, and Plaintiff does not contend otherwise, the Court must dismiss his due process claims under Rule 12(b)(6) unless an exception to the exhaustion requirement applies. *See, e.g.*, *Johnson*, 368 F. Supp. 2d at 52 (holding that plaintiff's "failure to allege in her complaint that she has exhausted her administrative remedies . . . constitutes a failure to state claims on which relief may be granted in this Court"), *aff'd*, 552 F.3d 806, 814 (D.C. Cir. 2008) (holding that the district court "correctly dismissed Johnson's complaint . . . for failure to exhaust her remedies"); *cf. Lucas v. District of Columbia*, No. 13-cv-143, 2018 WL 999903, at *3 (D.D.C. Feb. 21, 2018) (finding that a plaintiff's complaint "sufficiently alleged exhaustion under the CMPA"). The Court addresses that question below.

#### 4.   Plaintiff Has Failed to Demonstrate that the Futility Exception Applies.

As the Court just recognized, the Court's inquiry into Plaintiff's due process claims does not end by simply finding that he failed to exhaust because "courts sometimes recognize exceptions to the CMPA when the plaintiff's exhaustion of remedies would be futile." *Hill v. Gray*, 28 F. Supp. 3d 47, 55 (D.D.C. 2014). Plaintiff argues that any appeal under the CMPA would have been futile because he faced a "threshold problem" in that "he had no idea when the District would act against him." ECF 29 at 3. Plaintiff also says his attempts to "penetrate DCPS's opaque non-reasons for his mistreatment for almost two years" further demonstrate futility. *Id*. Additionally, Plaintiff contends that he should be permitted to amend his complaint, for a third time, to include additional factual support for this position. *Id.*

None of Plaintiff's arguments give rise to any inference or finding that exhaustion would be futile. To invoke the futility exception, a plaintiff must make a "clear and positive showing" that "the prescribed remedy would not provide adequate relief or . . . would certainly result in an adverse decision." *Hill*, 28 F. Supp. 3d at 55. A remedy provides adequate relief so long as the plaintiff could obtain "some of" the remedy "he seeks." *See Winter v. Loc. Union No. 639, Affiliated With Int'l. Bhd. of Teamsters*, 569 F.2d 146, 149 (D.C. Cir. 1977); *see also White v. District of Columbia*, 852 A.2d 922, 926–27 (D.C. 2004) (acknowledging that some remedies "that may be awarded in constitutional or tort litigation" are unavailable under the CMPA, but that the CMPA remains "the sole remedy for District employees"). And a remedy would certainly result in an adverse decision when the "agency charged with [the decision] has indicated that it does not have jurisdiction over the dispute, or because it has evidenced a strong stand on the issue in question and an unwillingness to reconsider the issue." *Randolph–Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 105–06 (D.C. Cir. 1986); *Winter*, 569 F.2d at 149 (observing that cases

21

that have excused exhaustion based on "hostility, arbitrariness, or bad faith" have "involved quite extreme facts"). Because Plaintiff makes no allegations or argument demonstrating that his remedy would be inadequate or that he would have certainly received an adverse decision, the Court finds the futility exception does not apply.

First, the remedies available through the CMPA would provide at least some of the relief that Plaintiff seeks. ECF 24-2 ¶ 127. Specifically, Plaintiff seeks compensatory damages for "lost wages, for his emotional distress . . . , and for enduring harm to his reputation, self-esteem and quality of life," as well as punitive damages and declaratory relief. *Id*. There is no question that Plaintiff can get monetary relief, including backpay, through the CMPA. *Thompson*, 593 A.2d at 635 (recognizing that the CMPA allows employees to seek reinstatement and backpay). Indeed "[a]s the D.C. Court of Appeals has noted, the remedies available under [the] CMPA are substantial and may, in some respects, afford more complete relief than the damage remedies available at common law." *Hoey*, 540 F. Supp. 2d at 228 n.5. The administrative process would also have allowed Plaintiff to obtain the explanation he seeks from the District, as well as to contest any basis for his reputational harms. D.C. Code § 1–606.04(c) (providing employees with the rights to "review any material upon which the . . . action is based" and to provide a response). Under the process, the OEA could also conclude that DCPS's actions in suspending or terminating Plaintiff were "unwarranted" and order "corrective or remedial action." *Id*. § 1–616.52(b). Plaintiff extends no argument as to why these procedures and the relief available through them would be inadequate to remedy his injury.

While the parties do not discuss this issue, the Court recognizes that the CMPA does not provide for punitive damages, and that Plaintiff seeks punitive damages in this action.[7] But that

---

[7] In considering the issue, the Court does not decide whether punitive damages are in fact available to Plaintiff here.

does not mean that the CMPA's remedies are inadequate.[8] As another court in this district has found, "[a]ffirmative relief through OEA [can] deliver to [Plaintiff] all the relief he seeks before this Court save for punitive damages," but if plaintiffs could avoid dismissal "simply by pleading for punitive damages, the exhaustion requirement would be far too easily evaded." *Hoey*, 540 F. Supp. 2d at 228 n.5; *see White*, 852 A.2d at 927 ("An exclusive remedy does not lose its exclusivity upon a showing that an alternative remedy might be more generous."). There is nothing suggesting that the available relief through the administrative process, while not "co-extensive with judicial remedies" such as compensatory and punitive damages, is not sufficient to "right the wrong" he suffered. *Hoey*, 540 F. Supp. 2d at 228 n.5.

Next, Plaintiff "nowhere alleges, and the Court has no reason to believe" that he would be "certain of an adverse administrative decision." *Johnson*, 368 F. Supp. 2d at 49. For example, courts have found such certainty in cases where the administrative agency "lacks, or believes itself to lack, jurisdiction to act upon the dispute" or where "an agency has articulated a very clear position on the issue which it has demonstrated it would be unwilling to consider." *Id.* Plaintiff has made no allegation, for example, that the OEA has "flatly proclaimed" it would refuse to consider his claims. *See id.* Instead, Plaintiff suggests the opaque nature of Defendants' communications rendered recourse under the CMPA procedures futile and that he could potentially amend his complaint to include that allegation. ECF 29 at 3. But that claim does not demonstrate futility. For

---

[8] Some courts in this district have concluded that courts cannot "dismiss[] federal claims in cases in which a D.C. employee requests punitive damages." *Washington*, 538 F. Supp. 2d at 276 (collecting cases). Other district courts have distinguished those cases as relying on precedent from the D.C. Circuit focused on the doctrine of *Younger* abstention, rather than exhaustion. *Id.* at 276–277 (describing district court cases relying on *Bridges v. Kelly*, 84 F.3d 470 (D.C. Cir. 1996)). Because Plaintiff does not address any of these cases nor related arguments, the Court declines to delve into this issue further. Instead, it joins the district courts in *Washington* and *Johnson* in finding that an inability to recover punitive damages through the CMPA administrative process does not preclude dismissal of a case based on failure to exhaust. *See Johnson*, 368 F. Supp. 2d at 50 n.9 ("[T]he adequacy of the administrative forum for exhaustion doctrine purposes turns not on what the plaintiff might recover on a federal claim, but rather on what the plaintiff deserves in light of his or her injuries.").

one, the appeals process under the OEA or through the CBA grievance procedure would have been conducted by a distinct body, with specific procedural requirements that ensure employees have an opportunity to contest adverse decisions made against them—not the individual Defendants that Plaintiff interacted with. *See* D.C. Code § 1–606.04 (outlining OEA hearing procedures including assigning a hearing officer, allowing the employee to be represented by an attorney, and providing a chance to review "any material upon which the . . . action is based"). Plaintiffs' allegations about the way certain individual Defendants dealt with him "does not lend support to a finding that the *OEA* would not provide adequate relief or that the *OEA* would certainly provide a decision against" him. *Hill*, 28 F. Supp. 3d at 56. Otherwise, everyone who had a contentious interaction with a District employee could claim futility in the administrative process.

Plaintiff's argument that he was unaware "whether he had a cognizable grievance"—and therefore could not pursue a timely administrative remedy—also does not demonstrate futility. ECF 29 at 3. Plaintiff acknowledges he received notice of being placed on "indefinite administrative leave" on November 3, 2016. ECF 24-2 ¶ 28. This triggered a 30-day clock for Plaintiff to appeal that action.[9] As such, the statutory scheme provided Plaintiff with an opportunity to engage with the required administrative processes. Plaintiff's failure to exhaust because of his "lack of knowledge of the process rather than any compelling circumstances" is "not sufficient to permit [the Court] to ignore or overlook the exhaustion requirement." *Burton v. District of Columbia*, 835 A.2d 1076, 1080 (D.C. 2003); *see also Lucas v. District of Columbia*, 133 F. Supp. 3d 176, 185 (D.D.C. 2015) (finding that years of taking "informal steps to resolve a dispute but never fil[ing] a formal grievance did not merit a waiver of prudential exhaustion"). Because

---

[9] Plaintiff claims he could not "meet an impossibly short 14-day contract grievance deadline." ECF 29 at 3. It is unclear what Plaintiff bases this timeline on. According to D.C. Code § 1–606.03(a), Plaintiff had 30 days to appeal from "the effective date of the appealed agency action."

Plaintiff has not adequately alleged that the remedies available under the CMPA would not provide adequate relief or would certainly result in adversity, he has failed to make the clear and positive showing necessary to establish futility.

Finally, the Court denies Plaintiff's request to amend his complaint. Plaintiff argues that he can "easily amend his complaint" again "to allege expressly that his 'recourse' to the CMPA would have been futile." ECF 29 at 3. First, a plaintiff cannot seek leave to amend his complaint through a brief in opposition. Such requests must be made by motion. *See Confederate Mem's Ass'n, Inc., v. Hines*, 995 F.d 295, 299 (D.C. Cir. 1993) (recognizing that "a bare request in an opposition to a motion to dismiss . . . does not constitute a motion within the contemplation of Rule 15(a)"). Further, under the local rules of this Court, those motions must be accompanied by "an original of the proposed pleading as amended," which Plaintiff has not submitted. LCvR 7(i). Nonetheless, the Court has considered Plaintiff's legal arguments concerning the alleged futility of the administrative process and did not find them persuasive. Much of the Court's conclusions—like the availability of remedies in the administrative process and the Court's discussion of the administrative procedure and its timeline—are not matters about which Plaintiff could add allegations to cure. And with respect to Plaintiff's claims concerning certain Defendants' delayed responses to his inquiries, it does not appear to the Court that Plaintiff has any allegations to add beyond what he has already detailed in his complaint about his extended communications back and forth with DCPS. As discussed above, allegations about his dealings with certain individual Defendants does not shed light on whether engagement with the administrative process would have been futile. And even if the Court were to consider Plaintiff's opposition as a request for leave to amend, Plaintiff also has not suggested the existence of any facts that would allow the Court to infer that "exceptional circumstances" existed that would have rendered the administrative

procedure "clearly useless." *Randolph-Sheppard*, 795 F.2d at 105–06. Accordingly, the Court denies Plaintiff's request to amend his complaint for a third time because he cannot seek leave to amend through an opposition and, even with the amendments that Plaintiff suggests, the amended complaint would not lead the Court to waive the exhaustion requirement. *See* Fed. R. Civ. P. 15(a)(2) (stating that a party may only amend a pleading under these circumstances with "the court's leave"); *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile, as the district court did here, if the proposed claim would not survive a motion to dismiss."). Accordingly, the Court dismisses Plaintiff's substantive and procedural due process claims for failure to exhaust under the CMPA.

## B. First Amendment Retaliation Claim

Finally, the Court addresses the merits of Plaintiff's First Amendment retaliation claim. Plaintiff alleges that his Facebook Live video was "protected personal speech on matters of significant public concern" and his pay was cut off "in retaliation" for this free expression. ECF 24-2 ¶¶ 99–107. The Court finds that Plaintiff was speaking not as a citizen on a matter of public concern, but as a teacher complaining about his place of employment and supervisors, and his speech was thus unprotected. Accordingly, the Court will also dismiss this claim under Rule 12(b)(6).

To state a claim of First Amendment retaliation as a public employee, the Supreme Court has laid out a two-step inquiry:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader

26

discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *see also Bowie v. Maddox*, 642 F.3d 1122, 1133 (D.C. Cir. 2011). The first factor can be broken down into two requirements: "the employee must have spoken (1) as a citizen, and (2) on a matter of public concern." *Mpoy v. Rhee*, 758 F.3d 285, 290 (D.C. Cir. 2014). Such protected speech stands in contrast to speech that a plaintiff undertakes as part of their official employment duties. In *Garcetti v. Ceballos*, for example, the Supreme Court held that a prosecutor's written memorandum was not protected under the First Amendment because it was written "pursuant to [his] official duties" and as part of what he "was employed to do." 547 U.S. at 421.

The Supreme Court has recognized that such cases require balancing "the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). In *Pickering*, a teacher wrote a letter in the local newspaper attacking, among other issues, the school board's "allocation of financial resources between the schools' educational and athletic programs." *Id.* at 566. The school board found that some of the statements the teacher made were false and "detrimental to the best interests of the schools." *Id.* at 567. The Supreme Court held that the teacher's speech was constitutionally protected because the school system's funding is of "legitimate public concern" and requires "free and open debate" by the electorate. *Id.* at 571–72. In its opinion, the Supreme Court highlighted three aspects of Pickering's speech that signaled that it was made in his capacity as a citizen, not an employee. First, the speech was "in no way directed towards any person with whom [he] would normally be in contact in the course of his daily work as a teacher." *Id.* 569–70. His speech thus presented no difficulties for "maintaining either

27

discipline by immediate superiors or harmony among coworkers." *Id.* at 570. Second, the Court found that discussions about athletic funding "were matters of public record on which [Pickering's] position as a teacher in the district did not qualify him to speak with any greater authority than any other taxpayer." *Id.* at 572. While the statements in his letter were false, his statements were not on "matters so closely related to the day-to-day operations of the schools" and did not have "any harmful impact on the public [that] would be difficult to counter because of the teacher's presumed greater access to the real facts." *Id.* Finally, Pickering's letter did not "either impede[] [his] proper performance of his daily duties in the classroom or. . . interfere[] with the regular operation of the schools." *Id.* at 572–73. In sum, the school had no greater interest in limiting Pickering's speech than "a similar contribution by any member of the general public." *Id.* at 573.

In another case, the D.C. Circuit considered a DCPS special education teacher's claims that he was fired for "reporting the misconduct and inappropriate conditions" at his school. *Mpoy*, 758 F.3d at 291. The circuit re-affirmed that such speech is "unprotected by the First Amendment because it 'reported conduct that interfered with his job responsibilities.'" *Id*. (quoting *Winder v. Este*, 566 F.3d 209, 215 (D.C. Cir. 2009)). The teacher indicated that he believed his "primary duty [was] to ensure student achievement" and that certain actions by the school and its principal "had been interfering with that primary duty." *Id*. He accused his teaching assistants of "disrupt[ing] the educational process" and the principal of "fail[ing] to respond . . . or take action of any kind." *Id*. at 291–92. The circuit found that the district court had correctly dismissed these claims, *id.* at 295–96, given that the speech, as described by the district court, raised issues that were "part and parcel of his concerns as a school teacher." *Mpoy v. Fenty*, 901 F. Supp. 2d 144, 154 (D.D.C. 2012).[10]

---

[10] The First Amendment claim in *Mpoy* was dismissed under a Rule 12(c) motion for judgment on the pleadings. The same standard applies as for Rule 12(b)(6) motions to dismiss. *Mpoy*, 901 F. Supp. 2d at 149.

28

Applying these factors to Plaintiff's speech, his Facebook Live video clearly features him speaking as a teacher and not a citizen. First, he raises concerns about his superiors by name, directly targeting people who he "would normally be in contact in the course of his daily work as a teacher." *Pickering*, 391 U.S. at 569–70. He tells kids, "either I'm going to be the principal or they're going to bring a new principal. Mr. Cartland ain't gonna be principal no more." Defendants' Exhibit B at 9:29–9:38; *id.* at 11:53–11:57 ("I'm not coming back until Mr. Cartland is gone."). Next, Plaintiff addresses students and calls them to come help him protest or bring change to Wheatley. *Id.* at 13:23–13:26 ("I got four of my students [here]. I need more of my students to come."); *id.* at 4:30–4:33 ("All my kids come up to the m*********** school, we turning up."). Inciting students to action—and repeatedly denigrating other teachers and administrators in front of them—undoubtedly "interfere[s] with the regular operation of the school[]." *Pickering*, 391 U.S. at 572–73. He even makes these statements on school grounds as he is physically attempting to enter the locked building. Defendants' Exhibit B at 1:30–1:36 ("[O]pen up the f****** door, Wheatley Education Campus, before I get crazy."); *id.* at 2:11–2:24 ("They don't even want to open up the door for me. That's f***** up. I done put five years into this m*********** school and I'm not a crazy dude."); *see also id.* at 8:17–8:24 ("I think the school is on a lockdown or something. I thought it was because of me, but it might not be. There might be something else going on.").

Finally, Plaintiff purported to know about misconduct that occurred at Wheatley precisely because he was a teacher there. *Cf. Pickering*, 391 U.S. at 572 (noting that speech can have more of a "harmful impact on the public" if it is thought to reflect a "teacher's presumed greater access to the real facts"). Plaintiff repeatedly states that only insiders know that a rape occurred at Wheatley. Defendants' Exhibit B at 14:35–14:55 (telling the police officer that there "was a rape

29

that went on last year that wasn't reported to the proper authorities . . . There's a gentleman in there who is guilty of the crime with an eighth-grade student. They know about it."). And these statements were made in connection with his statements about why he did not want to work at the school anymore, why he was demanding the principal's resignation, and why he thought he was in a better position to lead the school. *Id.* at 9:29–9:38 (telling two former Wheatley pupils that "either I'm going to be the principal or they're going to bring a new principal"); *id.* at 20:57–21:12 ("There was a rape that happened at my school last year and my principal did not report it through the appropriate channels. Now I'm asking for his resignation. I'm sorry. I can't live like this no more. He got to go."). Plaintiff's statements make clear that he sought to "report[] conduct that interferes with his job responsibilities, even if the report is made outside his chain of command."[11]

---

[11] There is some uncertainty in this circuit about whether this test, as originally laid out in *Winder*, has survived the Supreme Court's decision in *Lane v. Franks*, 573 U.S. 228 (2014). *Lane* held that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee— rather than citizen—speech." *Id.* at 240. Instead, the question "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 240. As the D.C. Circuit has recognized, "*Winder*'s broad language" which leaves an "employee unprotected when he reports conduct that 'interferes with his job responsibilities,' could be in tension with *Lane*'s holding that an employee's speech is unprotected only when it is within the scope of the employee's 'ordinary job responsibilities.'" *Mpoy*, 758 F.3d at 294. But the circuit has said that *Lane* "does not directly or necessarily contradict Winder[]," *id.*, and other courts in this district continue to apply the *Winder* standard, *see, e.g.*, *Lewis v. District of Columbia*, 282 F. Supp. 3d 169, 180 (D.D.C. 2017).

The Court thus analyzes Plaintiff's speech in the context of the *Winder* standard, which remains good law in this circuit. *Martin v. District of Columbia*, 78 F. Supp. 3d 279, 325 (D.D.C. 2015) ("*Winder* and the principles of *stare decisis* must control: It is a long-standing rule of the D.C. Circuit that prior panel decisions are binding unless withdrawn by the panel or overruled by the court sitting *en banc*."). Even after *Lane*, Plaintiff's speech could fall under the umbrella of employee speech. It is true that Plaintiff's speech was not part of his ordinary job duties in the sense that he was not called upon to make the Facebook Live video as part of his employment. But the *Lane* court left room for the possibility that the scope of employment duties could be broader than an employee's literal day-to-day tasks. Other courts in this district have characterized *Winder* as addressing a question left unanswered by *Lane*: "What characterizes speech that is itself ordinarily within the scope of an employee's duties"? *Martin*, 78 F. Supp. 3d at 325. Those courts have recognized that whistleblowing can constitute part of an employee's "undisputed duty" to "report[] conduct that interfere[s] with his job responsibilities." *Sanders*, 85 F. Supp. 3d at 534 (citing *Mpoy*, 758 F.3d at 291). In *Martin*, for example, another court in this district held that "any speech that furthers those ordinary duties by attempting to eliminate interference would fall within the scope of those duties and thus also be unprotected" and that the speech is not required to be part of activities that "occur with some degree of frequency" in the regular performance of the job. *Martin*, 78 F. Supp. 3d at 325. Plaintiff attempts to call out those who interfere with his "ordinary duties" as a teacher and speaks in furtherance of those duties—to protect and educate students at Wheatley. The D.C Circuit has found that similar speech is "government employee speech" even after *Lane*. *Mpoy*, 758 F.3d at 291, 293 (finding that Mpoy spoke as an employee when he said that "[a]s a teacher, my primary duty is to ensure student achievement"

*Winder*, 566 F.3d at 215; *Mpoy*, 901 F. Supp. 2d at 155 ("The form and context in which Mpoy's complaints were made are indicative of the fact that they intended to address only matters connected with his job at [the school]."). Plaintiff saw protecting students and facilitating a good learning environment for them as part of his job as a teacher. Defendants' Exhibit B at 1:00–1:30 (describing how the school let students down because they performed poorly on standardized tests and crediting himself with improving their scores); *id.* at 11:53–11:57 ("[A]t the end of the day, I'm about y'all learning."); *id.* at 16:32–16:34 ("I'm all about protecting young lives."). He said that the school has failed his students, attacked his superiors' management of the school, and argued that he is given insufficient responsibility at the school and should be given more, all while asking his students to help him spur the internal change. *Id.* at 1:50–2:09 ("If I used to teach you, . . . come to the school. Because we 'bout to expose everything that goes on at Wheatley and we're going to change this s*** for the better."). That is not the speech of an average citizen, but of a teacher who is upset at how his school is being run, seeking changes in school leadership and policy, and advocating for himself to have a role in that process. And at the end of the video, Plaintiff acknowledges the impact of the speech on his teaching career, saying, "My career is over. I did everything for these kids . . . I gave them my blood, I gave them my sweat, I gave them my tears. I'm done with education. I'm done with education." *Id.* at 23:25–23:45.

Plaintiff argues that his speech is protected under the First Amendment because it "contain[ed] public-concern content." ECF 29 at 13. He says that he was calling attention to an alleged rape of a student by a Wheatley staffer and notifying the public of "the many ways

---

and when he complained "about conduct that was disrupting the educational process in his own classroom"). Accordingly, applying *Lane* in conjunction with D.C. Circuit precedents, Plaintiff's speech here falls under the scope of his ordinary duties as an employee.

31

Wheatley was failing its students."[12] *Id*. at 13–14. Those allegations are undoubtedly disturbing and would likely be of interest to members of the public. However, the fact that the safety of students and quality of education are also matters of public concern does not alter the nature of Plaintiff's speech. As the Eleventh Circuit has noted, a public employee cannot "transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." *Boyce v. Andrew*, 510 F.3d 1333, 1344 (11th Cir. 2007). The key test is "not whether the public would be interested in the topic of the speech at issue but rather is whether the purpose of . . . the plaintiff's speech was to raise issues of public concern." *Id*. The speech of the plaintiffs in *Mpoy* and *Boyce* also touched on issues of public concern—educational standards and child safety, respectively—but the circuit courts nonetheless found that their speech was not protected. *Mpoy*, 758 F.3d at 292–93 (plaintiff's email raising concerns about the falsification of student performance and test results); *Boyce*, 510 F.3d at 1338 (plaintiffs spoke up raising concerns about deaths or injuries of children under child welfare's management).

While the Eleventh Circuit noted in *Boyce* that the "safety of children" under the county agency's supervision was an "issue of paramount importance to the purpose of the agency," the "main thrust" of the plaintiffs' speech was "not to raise public awareness." *Boyce*, 510 F.3d at 1344–46. Instead, those plaintiffs "primarily spoke as employees to improve their work environment." *Id*. at 1346. Similarly, Plaintiff's speech, while potentially addressing issues of public concern, cites those issues as examples of his problems working as a teacher under Principal Cartland. Defendants' Exhibit B at 20:54–21:12 ("There was a rape that happened at my school last year and my principal did not report it through the appropriate channels. Now I'm asking for

---

[12] Additionally, Plaintiff argues that whether his speech "bore directly on issues of public concern" is a question for the jury to decide. ECF 29 at 13. But it is well-established that the first two factors of the First Amendment retaliation test are "questions of law for the court to resolve." *Hall v. Ford*, 856 F.2d 255, 258 (D.C. Cir. 1988).

his resignation. I'm sorry. I can't live like this no more. He got to go."). He then repeats that "Scott Cartland should be fired. He need to resign because he allowed a rape to happen on Wheatley's campus and he didn't do s*** about it." *Id.* at 22:00–22:06. In context, Plaintiff's speech clearly concerns "individual personnel disputes and grievances" that he had with DCPS and Principal Cartland about how the school that he worked at was run. *Hall v. Ford*, 856 F.2d 255, 259 (D.C. Cir. 1988). And a public employee is not entitled under the Constitution to show up at their place of employment and broadcast on Facebook Live to stream a series of profane complaints against their direct supervisor—even if he included commentary on issues that implicated public health or safety. *See Garcetti*, 547 U.S. at 424 ("[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities.").[13] Because Plaintiff fails to sufficiently allege that he was speaking as a citizen on a matter of public concern, he has failed to state a First Amendment retaliation claim.

\* \* \*

Because Plaintiff's due process claims arise out of an employer-employee dispute with the District, he was required by the CMPA to undertake the relevant administrative processes and obtain a final decision before pursuing judicial relief for those claims. It is undisputed that Plaintiff did not attempt to engage with those processes and the Court will dismiss his due process claims

---

[13] The Court also observes that even if Plaintiff were speaking as an employee and on issues of public concern, the Court would then need to consider whether Defendants "had an adequate justification for treating the employee differently from any other member of the public based on [its] needs as an employer." *Lane*, 573 U.S. at 242. This seems to be an uphill battle for Plaintiff as well. Plaintiff's actions here not only involved speech, but a series of actions shown in his video. He strides up to the Wheatley school and bangs on the door, with children present. Defendants' Exhibit B at 1:30–2:27. He yells and issues a stream of profanity in front of students and takes them on rides in his car. *Id.* at 0:28–0:50; *id.* at 7:53–9:42. He attacks and undermines his supervisors and the principal of the school. *Id.* at 3:30–3:35 (saying that the people who work at the school "won't face [him] as men"); *id.* at 9:29–9:38 (attacking Principal Cartland). Courts have long recognized that government employers have an interest in "maintaining proper discipline in public service." *Lane*, 573 U.S. at 242. Defendants certainly have strong countervailing interests in the functioning of the school, including the protection of children, the maintenance of respect for the school, and preserving coworker and supervisor relationships.

for failure to exhaust the required administrative remedies. Additionally, the Court will dismiss his First Amendment retaliation claim because he was speaking in his capacity as a teacher about issues related to his job duties and not as a citizen on matters of public concern.

For the foregoing reasons, Defendants' motion to dismiss for failure to state a claim, ECF 26, is **GRANTED**, and as a result Plaintiff's complaint is **DISMISSED.** A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: July 24, 2026